# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| EMPLOYERS PREFERRED INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.   15-cv-1500 |
| | ) | Honorable Joe B. McDade |
| C&K HOTEL GROUP, LLC and CORINE WATTS, | ) ) ) | |
| Defendants. | ) | |

## O R D E R  &  O P I N I O N

This matter is before the Court upon motions for summary judgment filed by the Plaintiff, Employers Preferred Insurance Company (hereinafter "EPIC"), and one of the Defendants, C&K Hotel Group, LLC (hereinafter "CK"). The motions have been fully briefed and are ready for decision. Defendant Corine Watts has not participated in these proceedings. For the reasons stated below, EPIC's Motion for Summary Judgment (Doc. 45) is GRANTED and CK's Motion for Summary Judgment (Doc. 46) is DENIED.

### LEGAL STANDARDS

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th

1

Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the above standard before judgment will be granted in its favor. *See Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004); *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). Thus, the facts are construed in favor of the non-moving party, which differs depending on which motion is under consideration. *Tegtmeier*, 390 F.3d at 1045.

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [it] bears the burden of proof at trial." *Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the non-movant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Contrary to the understanding of many pro se litigants and an alarming number of attorneys who litigate matters before this Court, merely stating that a fact is disputed is not enough to establish that such a fact is genuinely disputed. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). Moreover, Central District of Illinois Local Rule 7.1(D)(1)(b) and (2)(b)(2) require citations to relevant documentary evidence. Courts are well within their discretion to treat unsupported facts as undisputed for purposes of deciding the summary judgment motion. Fed. R. Civ. P. 56(e).

## FACTS[1]

EPIC is an insurance company that extended an original workers' compensation insurance policy and renewal policy to CK in conjunction with a hotel

---

[1] These facts come from the Statement of Facts and the Statement of Additional Material Facts submitted by the parties. Defendant CK has responded to EPIC's facts in a confusing manner not consistent with Local Rule 7.1(D). CK has listed several facts as both undisputed and disputed in evidently an attempt to convey that it does not dispute part of the fact asserted by EPIC but does dispute a different part of the fact. Regardless, CK has failed to support each claim of disputed fact with evidentiary documentation by specific page as directed by the Local Rule, so the Court will not credit these so-called disputed facts as disputed but will treat them as undisputed.

that CK owns and operates in Bloomington, Illinois doing business as the Hawthorn Suites and Conference Center. In August of 2014, Corine Watts filed an Application for Adjustment of Claim with the Illinois Workers' Compensation Commission, alleging that she was injured on July 11, 2014 while putting away a sofa bed as part of her duties for her employer, CK, in its hotel.

EPIC provided workers' compensation insurance to CK under an insurance policy numbered EIG 1594376-00, which was effective from November 16, 2012 to November 16, 2013 (hereinafter the "00 policy") and was conditioned upon payment of specific premiums payable in future installments subject to annual audit for retrospective premiums. The 00 policy contained a provision stating that it would automatically be extended for one year unless EPIC gave CK sixty days' notice that it was not renewing the policy. The 00 policy was so extended and a renewal policy was issued by EPIC to CK on November 16, 2013, and given the number EIG 1594376-01 (hereinafter the "01 policy"), which was also conditioned upon payment of specific premiums payable in future installments subject to annual audit for retrospective premiums. Both the 00 and the 01 policies (Doc. 4-1) contain the following identical provisions:

"PART ONE
WORKERS COMPENSATION INSURANCE
A. How This Insurance Applies
This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.
1. Bodily injury by accident must occur during the policy period.
* * * *
C. We Will Defend

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits. We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

\* \* \* \*

## PART FIVE – PREMIUM

### A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

### B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposure you would have during the policy period. **If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.**

### C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. all your officers and employees engaged in work covered by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

\* \* \*

### E. Final Premium

**The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.** If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the

balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy. If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise: 1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium. 2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-rate cancelation table and procedure. Final premium will not be less than the minimum premium.

F. Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

\* \* \*

PREMIUM DUE DATE ENDORSEMENT

This endorsement is used to amend: Section D. of Part Five of the policy is replaced by this provision.

PART FIVE

PREMIUM

**D. Premium is amended to read:**

**You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid. The due date for audit and retrospective premiums is the date of the billing.**

\* \* \*

ILLINOIS AMENDATORY ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because Illinois is shown in Item 3.A. of the Information Page.

\* \* \*

Part Five (Premium), Section G. Audit is replaced by this Section.

Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy ends. Information developed by audit will be used to determine final premium. The National Council on Compensation Insurance has the same rights we have under this provision."

(Doc. 4-1 at passim (emphasis added)).

CK was originally charged an estimated premium of $4,258 for the 00 policy. That amount was based on a figure of $175,000 in remuneration for employees in the classification "Clerical Office Employees" (Code 8810) and a figure of $95,000 in remuneration for employees in the classification "Hotel: All Other Employees & Salespersons, Drivers" (Code 9052). In accordance with the terms of the 00 policy, a premium audit was performed by EPIC after that policy ended. The final premium for the 00 policy was determined to be $9,652, leaving a balance due of $5,394. On February 5, 2014, EPIC sent a bill to CK demanding payment of the outstanding $5,394 within 20 days. (Doc. 4-3). The outstanding balance of $5,394 was not paid by CK until July 17, 2014. Meanwhile, a Notice of Cancellation ("NOC") was issued by EPIC on May 27, 2014 and was mailed on May 28, 2014 to C&K Hotel Group, LLC at 1 Lyon Ct., Bloomington, IL 61701.

The NOC stated: "You are hereby notified in accordance with the terms and conditions of the above mentioned policy, and in accordance with law, that your insurance will cease at and from the hour and date mentioned above. Reason for cancellation: Premium Nonpayment." The policy mentioned in the notice was the 01 policy, and the hour and date mentioned was 12:01 a.m. on June 10, 2014. The NOC also specifically referenced the unpaid balance of $5,394 that arose from the final audit. The mailing address of 1 Lyon Court, Bloomington, IL 61701 is the only address listed on the 01 policy and was the only mailing address that was ever used by CK.

Both the 00 and the 01 policies (Doc. 4-1) also contain the following identical provisions regarding policy cancellation:

"ILLINOIS AMENDATORY ENDORSEMENT

This endorsement applies only to the insurance provided by the policy because Illinois is shown in Item 3.A. of the Information Page.

Part Six (Conditions), Condition A. Inspection, Condition D. Cancellation and Condition E. Sole Representative of the policy are replaced by these four Conditions.

\* \* \*

Cancellation

\* \* \*

2. We may cancel this policy. We will mail to each named insured and to the broker or the agent of record advance written notice stating when the cancellation is to take effect.

3. If we cancel because you do not pay all premium when due, we will mail the notice of cancellation at least ten days before the cancellation is to take effect. . .

\* \* \*

4. If this policy has been in effect for 60 days or more, we may cancel only for one of the following reasons:

a. Nonpayment of premium.

\* \* \*

5. Our notice of cancellation will state our reasons for canceling.

6. The policy period will end on the day and hour stated in the cancellation notice."

(Doc. 4-1).

CK's representative and partial owner, Chanchal Sandhu, paid the overdue premium for the 00 policy on July 17, 2014 by giving his credit card number over the phone to a representative of EPIC. According to him, that day over the phone was the first time he had ever been informed that his policy was cancelled. EPIC made no

representation to Sandhu that making the payment would result in the reinstatement of the 01 policy or rescission of the policy cancellation.

Although the 01 policy was cancelled as of June 10, 2014, EPIC accepted two further premium payments from CK on the 01 policy because it contends the final premium for that policy had not yet been determined, and thus until the premium audit was performed, it was uncertain whether, or how much, CK may have still owed on the policy. CK contends the acceptance of these payments constituted a ratification of the policy. After the premium audit of the 01 policy was performed and the final premium amount of the 01 policy calculated, it was determined that CK had overpaid on the 01 policy. The excess premium was refunded to CK.

EPIC provided notice of the pending cancellation of CK's policy to the National Council on Compensation Insurance, which acts as the agent for the Illinois Workers' Compensation Commission for the purpose of receiving such notices; and the notice was received by the council on May 28, 2014.

## DISCUSSION

## I. JURISDICTION

### A. Diversity Jurisdiction

CK contends this Court does not have subject matter jurisdiction over this civil action because there is no current controversy between the diverse parties that exceeds a value of $75,000. The Court already addressed and rejected this argument in its Order and Opinion of February 25, 2016 disposing of the Defendants' motions

to dismiss. (Doc. 16). Nevertheless, the Court will again briefly discuss why subject-matter jurisdiction is appropriate.

Title 28, section 1332 of the United States Code confers jurisdiction upon district courts to hear civil actions involving controversies exceeding the sum or value of $75,000 between citizens of different States. Another statute, 28 U.S.C. § 2201, empowers federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." EPIC was incorporated in Florida and maintains its principal place of business in Nevada. Defendants are citizens of Illinois. There is no contention before the Court that there is not complete diversity between the Plaintiff and the Defendants in this action.

Instead, CK contends that since the damages Ms. Watts has suffered have not been conclusively determined yet, one cannot know for certain that the amount in controversy between EPIC and CK is equal to or greater than $75,000. For some reason, CK chooses to ignore unambiguous Seventh Circuit precedent holding that "[i]f a suit is filed initially in federal court, a plaintiff's good-faith estimate of the stakes controls unless it is legally impossible for a court to award what the plaintiff demands." *McCormick v. Indep. Life & Annuity Co.*, 794 F.3d 817, 818 (7th Cir. 2015) (citing *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)).

EPIC has presented more than enough evidence to show it has a good faith basis to estimate the amount at issue between it and CK will well exceed $75,000 even though the amount has not been conclusively determined. EPIC has

demonstrated that Ms. Watts' workers' compensation attorney claims she has suffered damages in excess of $500,000. (Doc. 48-1 at 3). EPIC also points to Ms. Watts' admission that the amount of recovery she is seeking in the workers' compensation claim, including medical expenses, lost wages and compensation for pain and suffering, exceeds the sum of $75,000. (Doc. 18 at ¶4 admitting allegation in Amended Complaint, Doc. 4).

In *Meridian Security Insurance Company v. Sadowski*, 441 F.3d 536 (2006), a case where an insurer sought a declaratory judgment on its obligation to defend and indemnify a policyholder who was being sued in Illinois state court, the Seventh Circuit vacated a district court's opinion that the district court lacked diversity jurisdiction over an action because the underlying amount in question had not yet been determined. *Id.* at 537-38. The court held that the proponent of federal jurisdiction is to simply offer a good faith estimate of the value of the claim and for subject matter jurisdiction to be found lacking, it must appear to a legal certainty from the face of the complaint that the claim is really for a less than the jurisdictional amount. *Id.* at 541. CK has not presented anything that demonstrates it is legally impossible for Watts to recover a sum greater than $75,000 from CK. Therefore, subject matter jurisdiction is appropriate here under 28 U.S.C. § 1332.

## B. Failure to Exhaust Remedies Under the Illinois Workers' Compensation Act

Next CK contends that EPIC has failed to exhaust its administrative remedies by choosing to file this action for declaratory judgment instead of pursuing its remedies through the Illinois Workers' Compensation Commission (hereinafter the

"IWCC"). The IWCC is an administrative agency which was created to administer the Illinois Workers' Compensation Act codified at 820 Ill. Comp. Stat. 305 *et. seq.* 820 Ill. Comp. Stat. Ann. 305/13 ("The Illinois Workers' Compensation Commission shall administer this Act."); *Textile Maint. v. Indus. Comm'n*, 636 N.E.2d 748, 750 (Ill. App. Ct. 2d Dist. 1994). The Act provides that "[a]ll questions arising under this Act, if not settled by agreement of the parties interested therein, shall, except as otherwise provided, be determined by the Commission. Claims from current and former employees of the Commission shall be determined in accordance with Section 18.1 of this Act." 820 Ill. Comp. Stat. 305/18.

Despite the above-quoted language, the Illinois Supreme Court has held that Illinois circuit courts and the IWCC have concurrent jurisdiction to hear workers' compensation insurance coverage disputes, with the jurisdiction of the circuit courts paramount to that of the IWCC. *Employers Mut. Companies v. Skilling*, 644 N.E.2d 1163, 1165 (1994). The *Skilling* court made clear that "[i]t is the particular province of the courts to resolve questions of law such as the one presented in the instant declaratory judgment case. Administrative agencies are given wide latitude in resolving factual issues but not in resolving matters of law." Thus in cases where the employee's entitlement to benefits is not at issue but rather the rights and duties of an insurer vis-à-vis its insured are, jurisdiction is proper before the courts. *See, e.g., Pekin Ins. Co. v. Campbell*, 2015 IL App (4th) 140955, ¶¶ 34-38, 44 N.E.3d 1103, 1109–11; *Hastings Mut. Ins. Co. v. Ultimate Backyard, LLC*, 2012 IL App (1st) 101751, ¶¶ 31-32, 965 N.E.2d 656, 666. And while CK is correct that the Illinois

Supreme Court called into question the depth of the analysis undertaken by the *Skilling* court in *J & J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 24 (2016), 67 N.E.3d 243, 250, it did not overrule nor disagree with the *Skilling* court's holding. Moreover, the *J & J Ventures* court did not even examine nor mention the issue of whether the type of dispute in this action, a coverage dispute over a worker's compensation insurance policy, was to be heard by the IWCC instead of a court.

In sum, this Court does not see any reason to disagree with the *Skilling* court's conclusion that a workers' compensation insurance coverage dispute between an insurer and its insured is proper before a court of first instance. It makes no difference whether the court is an Illinois circuit court or a federal district court exercising its diversity jurisdiction. "[A] federal court will follow and accept as correct the decisions of the highest court of a state as to the powers and the extent of the jurisdiction of the courts of that state." Thus, "when a case comes into the [d]istrict [c]ourt under the diversity statute, that court is only another court enforcing the cause of action which, in the absence of diversity, would necessarily have been brought in the state court." *Tr. Co. of Chicago v. Pennsylvania R. Co.*, 183 F.2d 640, 642 (7th Cir. 1950).

CK makes the dubious claim that facts surrounding whether Ms. Watts is entitled to benefits impact this action. They do not. The straightforward issue here is whether CK was insured by EPIC on July 11, 2014. Answering that question does not require any analysis into what Ms. Watts was doing on that date. Jurisdiction is proper before this Court and EPIC was not obligated to pursue this matter before the IWCC before filing the instant action in this Court.

## II. WHETHER THE 01 POLICY COULD BE TERMINATED DUE TO FAILURE TO PAY THE BALANCE DUE ON THE 00 POLICY

The primary issue in this matter is whether the 01 policy could be properly cancelled due to failure to pay the balance due on the 00 policy. CK frames the issue as whether the current 01 policy was conditioned upon payments of final premium pursuant to an audit of the previous 00 policy. Under Illinois law, which applies in this diversity action as a matter of law[2] and by way of the provisions of the policies at issue,[3] generally when "a policy renewal is made …, the terms of the original policy become part of the renewal contract of insurance." *Rivota v. Kaplan*, 364 N.E.2d 337, 344 (Ill. App. Ct. 5th Dist. 1977). The 00 policy provides:

Nonrenewal

1.      We may elect not to renew the policy. If we fail to give 60-days notice, the policy will automatically be extended for one year….

(Doc. 4-1 at 31). There is no factual assertion that EPIC and CK gave notice of nonrenewal. Thus, the 00 policy was automatically renewed and <u>extended</u> as the 01 policy for a one year term. The 01 policy, like the 00 policy, expressly states it can be cancelled for nonpayment of premium.

An Illinois appellate court case, *Budget Premium Company v. American Casualty Company*, 483 N.E.2d 389 (3d Dist. 1985), provides apposite, controlling guidance. "In the absence of guiding decisions by the state's highest court, we consult

---

[2] In diversity cases, the district courts apply federal procedural law and state substantive law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).
[3] (Doc. 4-1 at 12 and 43) ("Part ONE of the policy applies to the Workers Compensation Law of the states listed here: Illinois").

and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree." *ADT Soc. Servs., Inc. v. Lisle–Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012).

Budget advanced $3,465 for premiums for a workers' compensation policy no. 81 on behalf of a cab company named Cab. Policy no. 81 ran from January 29, 1980, and expired on January 29, 1981. 483 N.E.2d at 390. Budget initially financed $4,011 and after an audit, financed an additional $5,072 for a workers' compensation policy no. 82 commencing February 10, 1981 and expiring January 29, 1982. *Id*. The estimated premium for policy no. 81 was $3,465. *Id*. After policy no. 81 expired, American audited Cab's payroll per the terms of the policy and assessed an earned premium for policy no. 81 at $7,846. *Id*. American billed Cab but was never paid for the deficiency of $4,381 which was due on April 10, 1981. *Id*. On May 28, 1981, American sent Cab a notice of cancellation, effective June 10, 1981, for nonpayment of premium even though the estimated premium for policy no. 82 was paid in full. *Id*. Budget argued that policy no. 81 was terminated and that policy no. 82, which was endorsed as paid in full, could not be cancelled for nonpayment of premium until an audit subsequent to expiration of policy no. 82 revealed a final premium due. *Id*.

The Illinois court rejected Budget's argument. 483 N.E.2d at 390. The court looked to the policy's terms and discovered that when the earned premium was computed upon expiration, the insured was either to pay the excess premium or receive the unearned premium. *Id*. If American cancelled, the pro-rata earned premium was to be computed and adjusted. *Id*.

The court then announced the applicable law. 483 N.E.2d at 390. It explained that "successive policies issued by the same insurer to the same insured, for the same or similar coverage are considered renewal policies" and that when "a policy is renewed, unless provided otherwise, the terms of the original policy become part of the renewal contract of insurance." *Id.* Thus, the court found that American issued one policy which was renewed and audited annually. *Id.* Even though Cab paid the premiums for policy no. 82 in full, the court found that Cab never paid the earned premiums for policy no. 81, and thus breached its contractual obligation. *Id.* The court determined that American had acted properly in cancelling policy no. 82 (which was not a separate and distinct policy but simply the renewed policy no. 81), calculating the pro-rata earned premium for policy no. 82, using Cab's estimated premiums toward policy no. 82 to liquidate all earned premiums under policy no. 81 and, appropriately returning the unearned premiums that remained. *Id.*

CK's attempts to distinguish the facts and holding of *Budget* from this case are unpersuasive. First, the Court finds CK's assertion that the "issue of whether the insurance company acted appropriately under the policy was not before the court" is simply incorrect. (*See* Doc. 49 at 10). The *Budget* court was clearly discussing the appropriateness of American's actions and it clearly held that those actions were appropriate. 483 N.E.2d at 390-91. Second, CK argues *Budget* is inapposite here because "American issued one policy on the same terms and though the insured paid the premiums for period two, the insured never paid the earned premiums for period one." (*See* Doc. 49 at 10). That is almost exactly what happened here.

The 00 policy was renewed and its terms and conditions became part of the 01 policy per Illinois law. Under the terms of the policy, EPIC audited and determined that the final premium under 00 policy was $5,394. It issued a bill to CK demanding payment of the outstanding $5,394 within 20 days on February 2, 2014. CK did not pay that bill. A Notice of Cancellation was issued by EPIC on May 27, 2014 and was mailed on May 28, 2014 to C&K Hotel Group, LLC at 1 Lyon Ct., Bloomington, IL 61701. CK did not pay the final premium until July 17, 2014. By that time the policy was cancelled and EPIC was entitled to receive payment for outstanding amounts of earned premium on the 00 policy and refund any unearned premiums for the 01 policy, which is exactly what EPIC did.

CK argues that "in this case, it is undisputed that there were two policies that contain different terms, most notably, that the second policy, as amended, contained a differen[t]*sic* address for the insured to which notice was to [be] *sic* made. It is uncontested that the policy was not a renewal. The policy provided for an extension under the same policy." (Doc. 49 at 11). The Court disagrees. Under applicable Illinois law and the terms of the 00 policy, the 01 policy was a renewal of the 00 policy and thus part and parcel of the same policy. *See Budget*, 483 N.E.2d at 391 ("Successive policies issued by the same insurer to the same insured, for the same or similar coverage are considered renewal policies" and that when "a policy is renewed, unless provided otherwise, the terms of the original policy become part of the renewal contract of insurance."). CK's contention that the absence of the term "Hawthorn Suites and Conference," which appears in the Named Insured and Address provision

of the 00 policy on its Information Page (Doc. 4-1 at 12) but does not appear on the Named Insured and Address provision of the 00 policy on its Information Page (Doc. 4-1 at 43) means no renewal was effectuated is without merit and unsupported by citation to any legal source.

So in conclusion, the Court finds that the 01 policy was a renewal of the 00 policy and the terms of the 00 policy became part of 01 policy. That conclusion obviates the import of CK's first two questions posed in its summary judgment motion. First, CK asked whether EPIC could cancel a policy of insurance based a premium installment that was not yet due and owing. The answer is of course obviously no, but as discussed above, that is not what EPIC did. Instead, EPIC cancelled a policy based upon a premium that was due and owing.

CK's second question—whether the current 01 policy was conditioned upon payments of final premium pursuant to audit of the previous 00 policy—is not a proper question given the Court's finding that the 01 policy was a renewal of the 00 policy. Given the state of Illinois law on the subject, one should understand the issue here to not be an issue of multiple policies, but rather an issue of multiple periods of coverage under a unified policy. Viewed as such, CK's second question is more properly framed as whether coverage for a subsequent, uninterrupted term of one year under a workmen's compensation insurance policy can be conditioned upon receiving earned premium relating to an immediately previous uninterrupted term of one year that has since concluded. The answer of course—supplied by *Budget*—is yes.

## III. WHETHER THE MAY 27, 2014 NOTICE OF CANCELLATION WAS PROPER

Next, CK contends it should be awarded summary judgment on the issue of whether its policy was in full force and effect on July 10, 2014 because EPIC failed to send proper notice of cancellation of the policy to the proper address. The parties agree that to know whether the May 27, 2014 NOC was proper, one must first look to see that all applicable requirements of Illinois law were met.

"[A] notice of cancellation must conform to the provisions of the insured's policy and the Illinois Insurance Code." *Textile Maint.*, 636 N.E.2d at 752. Insurance companies are held to a strict standard when they attempt to cancel policies for the nonpayment of a premiums. *Id.* at 751. Under the circumstances presented in this case, the Illinois Insurance Code requires the insurer to mail the notice at least ten days before cancellation to the last mailing address of the insured known to the insurance company along with a specific explanation of why the policy is being cancelled and an effective date of cancellation. The insurer must also retain proof of mailing of the notice on a recognized U.S. Post Office form or a form that is otherwise acceptable to the U.S. Post Office. 215 Ill. Comp. Stat. 5/143.11 through 5/143.16.

The policies provided that EPIC had the right to cancel the policy then in effect for nonpayment of premium. Per the terms of the policies, EPIC was obligated to mail to CK advance written notice stating when the cancellation was to take effect not less than ten days before such cancellation was to take effect. EPIC was to mail the NOC to CK at mailing address shown in Item 1 of the Information Page to prove notice. The policy period would end on the day and hour stated in the cancellation notice. (Doc. 4-1 at 62).

CK contends that because the NOC did not contain the designation *Hawthorn Suites And Conferences*, it was legally defective and unable to meet the standards for notices of cancellation under the Illinois Insurance Code. Remarkably, CK argues that the notice "was not sent to the last known address of the insured because it did not include the words Hawthorn Suites And Conference as required by in Section 1 of the declarations of policy Policy 00 and the December 23, 2013 Amended Declarations of policy 01." (Doc. 49 at 15). The 00 policy and the Amended Declarations for the 01 policy listed the Named Insured on its Information Page as:

> C&K HOTEL GROUP LLC
> HAWTHORN SUITES AND CONFERENCE
> 1 LYON CT
> BLOOMINGTON IL 61701

(Doc. 4-1 at 12; Doc 46-3 at 3). The NOC listed the Insured Name and Address as:

> C&K HOTEL GROUP LLC
> 1 LYON CT
> BLOOMINGTON IL 61701

(Doc. 4-3). CK has not presented any authority that leads this Court to conclude that EPIC's failure to include CK's trade name on the NOC rendered such notice defective. The two cases CK cites—*Verkruysse v. Neese*, 624 N.E.2d 421 (Ill. App. Ct. 3d Dist. 1993) and *Textile Maint.*, 636 N.E.2d 748—did not deal with an alleged deficiency in the notices of cancellation remotely similar to the alleged deficiency here and thus do not support CK's argument.

In *Verkruysse*, the court held that a notice of cancellation that failed to even mention nonpayment of premium could obviously not suffice to provide notice of cancellation for the alleged nonpayment of premium. 624 N.E.2d at 423. This makes

sense because the law requires a specific explanation of the reason why the insurer is cancelling the policy and the notice of cancellation in *Verkruysse* woefully failed to apprise the insurer of such reason.

The defect in *Textile Maintenance* is less egregious than the defect in *Verkruysse* and somewhat more similar to the alleged defect here but still not close enough to warrant this Court to find the NOC here was defective. In *Textile Maintenance*, the insurer mailed a notice of cancellation that identified the wrong insurer and contained the wrong zip code for the insured's address. 636 N.E.2d at 872. Clearly an incorrect zip code makes the address incorrect and means the insurer did not comply with the law and mail the notice to the last known address of the insured. Nothing comparable occurred in this case.

The Illinois Insurance Code requires the notice of cancellation to be mailed to the named insured at the last mailing address known to the insurer. 215 Ill. Comp. Stat. 5/143.14 and 5/143.16. The address provided on the NOC in this case was correct and matched the address provided on all the other documents: 1 Lyon Ct, Bloomington IL 61701. The alleged defect at issue here is actually in the name. The NOC did not contain the designation *Hawthorn Suites And Conferences* below C&K Hotel Group LLC, despite the fact that it appeared as the name in the Named Insured in the 00 policy and the Amended Declarations to the 01 policy.

All that can or need be said is so what? The omission of *Hawthorn Suites And Conferences* could not possibly frustrate mailing of the notice as the full street address of "1 Lyon Ct., Bloomington, IL 61701" and the full legal name of the insured, "C&K

Hotel Group, LLC" were correct and present on the NOC. The Court understands that Illinois cases such as *Textile Maintenance* hold that insurance companies are held to a strict standard when they attempt to cancel policies for the nonpayment of a premiums. 636 N.E.2d at 751. But the Court does not understand such a strict standard to mean parties are to be bound by meaningless technicalities that serve no real purpose. Since the full street address and the full legal name appeared on all policies, documents and the NOC, and Mr. Sandhu even testified no other buildings even exist on Lyon Court (Doc. 45-1 at 33), the Court finds the omission of the trade name *Hawthorn Suites And Conferences* did not render the NOC ineffective.

Additionally, the NOC complied with all the requirements of the policies as well as the Illinois Insurance Code. The NOC explained that the reason for cancellation was nonpayment of premium. The Court understands why CK takes issue with the fact that the NOC referred to the not yet due estimated installment payment of the 01 policy but the NOC adequately apprised the reader that cancellation was premised upon nonpayment of the final audit amount of $5,394.00. Moreover, the Court has not seen any authority for the proposition that such a defect rendered the cancellation notice ineffective as to the amount due and owing from the final audit of the 00 policy. The Court agrees with EPIC that the information provided on the notice was more than sufficient for CK to understand the reason for the cancellation and allow CK to either challenge the cancellation or request EPIC to correct the alleged defect that prompted the notice. The NOC stated the effective date of cancellation was June 10, 2014 at 12:01 a.m. Since the NOC was mailed on May

28, as proven by EPIC's showing of Document 4-4 at page 5, proof of mailing on PS Form 3877 (a recognized U.S. Post Office form), and cancellation was not effective until June 10, the required 10-day notice was satisfied. *See Hunt v. State Farm Mut. Auto. Ins. Co.*, 994 N.E.2d 561, 572 (Ill. App. Ct. 1st Dist. 2013) (concluding that FS Form 3877 is a recognized U.S. Post Office proof-of-mailing form or, at the least, is one "acceptable to the U.S. Post Office" for purposes of complying with the statute's "proof of mailing" requirement.).

EPIC submitted the affidavit of Timothy Spears, Vice-President of Underwriting for EPIC, to verify that the NOC provided by EPIC (Doc. 4-3) was a true and accurate copy of the actual NOC generated on May 27, 2014. In the affidavit, Spears also avers that he has personal knowledge of the facts set forth in the document. He states that EPIC maintains a duplicate copy of each NOC it sends to insureds in an electronic system called Image Right. He states he personally reviewed the records maintained in Image Right and based on such review he attests that that the NOC provided by EPIC (Doc. 4-3) was a true and accurate copy of the actual NOC generated on May 27, 2014.

In his deposition, Spears testified that he did not know how the actual NOC would have been placed in an envelope but that someone in the mailroom would have placed the actual NOC in the mail. (Doc. 45-4 at 63-64). This is not an actual fact in genuine dispute though because CK has produced nothing that establishes that EPIC failed to place the NOC in the mail. Although his testimony was vague and not helpful in helping the Court understand the logistics of EPIC's mailroom, Spears confirmed

there is someone in the mailroom who would have placed the actual NOC in the mail, for which EPIC has provided proof of mailing. Such evidentiary support is sufficient.

CK also contends that EPIC failed to produce proof that it sent the purported NOC to the IWCC as required by 820 Ill. Comp. Stat. 305/4(b). EPIC has provided an affidavit from one of its employees, Wayne Piotrowski, in which he avers that EPIC provided notice of the pending cancellation of CK's policy to the National Council on Compensation Insurance ("NCCI") and that the notice was received by the NCCI on May 28, 2014 (more than 10 days before the effective date of cancellation). (Doc. 45-9). "The NCCI is an organization which the IWCC contracted with to delegate some of its duties, including receiving and maintaining certificates of insurance and notices of termination of insurance coverage under section 4 of the Workers' Compensation Act." *Hastings Mut. Ins. Co.*, 2012 IL App (1st) 101751, ¶ 4, 965 N.E.2d at 659. Piotrowski further avers that EPIC has an affiliation agreement with the NCCI, through which the NCCI has agreed to transmit insurance policy information from EPIC, including notices of policy cancellations, to the IWCC.

Mr. Sandhu testified that he never received any indication that his policy with EPIC was in danger of cancellation or was in fact cancelled. A layperson would tend to think this is a disputed fact that would preclude summary judgment for an insurer. But such is not the case because under Illinois law, proper cancellation requires proper mailing of notice and retention of proper proof of notice. 215 Ill. Comp. Stat. 5/143.41(a). Proof of actual receipt of the notice is not required. *See*, *e.g.*, *Ragan v. Columbia Mut. Ins. Co.*, 701 N.E.2d 493, 497 (Ill. 1998) ("The language of section

143.14(a) is clear and unambiguous. First, it requires that the insurance company mail a notice of cancellation to the insured, and if applicable, to certain other parties. Second, the statute requires that "[t]he company shall maintain proof of mailing." (Emphasis added.) 215 ILCS 5/143.14(a) (West 1994). There is no alternative method for proving compliance with the proof of mailing requirements other than to maintain the proof of mailing. To allow other methods of proving compliance would circumvent the language and purpose of the statute…. The statute, therefore, requires proof of mailing rather than proof of receipt by the insured.").

For the reasons given above, the Court finds that the NOC (Doc. 4-3) was adequate under Illinois law and the terms of the policies at issue and that EPIC fulfilled its notice requirements under the Insurance Code.

## IV. WHETHER EPIC'S ACCEPTANCE OF MONTHLY INSTALLMENT PAYMENTS RATIFIED THE TERMS OF POLICIES SUCH THAT EPIC WAIVED ITS RIGHT TO CANCEL FOR NONPAYMENT OF PREMIUM

CK also argues that summary judgment is appropriate in its favor because EPIC allegedly waived its right to rely on the policy cancellation by accepting two payments from CK after June 10, 2014. On May 26, 2014, EPIC issued CK an invoice referencing the June 16, 2014 installment on the 01 policy for a total amount due of $864.65, which contained the following language: "Invoice will be considered past due if not paid by the due date or within 20 days from invoice date witch ever is later." (Doc 46-3 at 18). On June 13, 2014, EPIC accepted payment of $864.65 pursuant to the May 26, 2014 invoice without condition. (Doc. 45-8 at 3). Then on July 14, 2014, EPIC again, without condition, accepted payment of $864.65 pursuant to the July 16,

2014 installment schedule as identified in the Amended Declarations of policy EIG 1594376 01. (Doc. 45-8 at 3).

"A waiver is a voluntary relinquishment of a known right, claim or privilege." *Vaughn v. Speaker*, 533 N.E.2d 885, 890 (Ill. 1988). "It arises from a unilateral, affirmative act by the insurer. The party claiming waiver has the burden of proving that the insurer's words or conduct were inconsistent with an intent to rely on the provisions of the policy." *Loyola Univ. of Chicago v. Humana Ins. Co.*, 996 F.2d 895, 901 (7th Cir. 1993) (citing *Western Casualty & Surety Co. v. Brochu*, 475 N.E.2d 872, 878 (Ill. 1985) and *Buchalo v. Country Mutual Ins. Co.*, 404 N.E.2d 473, 478 (Ill. App. Ct. 1st Dist. 1980).

Issuing CK an invoice and taking the two payments of $864.45 after cancellation of the policy did not ratify the agreement between EPIC and CK such that the policy can be deemed to be in effect after the cancellation date. In both the cases cited by CK—*Perry v. Campbell*, 195 N.E.2d 844, 846 (Ill. App. Ct. 2d Dist. 1963) and *Cullotta v. Kemper Corp.*, 97 N.E.2d 1372 (Ill. 1979)—the insurers there took actions that clearly indicated their willingness to extend coverage over the time period in question. Such was not the case here.

For instance, in *Perry*, the insured was told by the insurer's agent that he was purchasing a policy that would last 2 years and the effective date on the insurance application was "9-21-57 to 9-21-59". 195 N.E.2d at 845. The insurer also mailed the insured an extension certificate that listed the extension period from September 21, 1958 to September 21, 1959 and stated: "This Insurance Extension Certificate

extends your policy for the period shown above upon payment of the premium indicated." *Id.* at 846. The insurer mailed the insured a cancellation notice notifying him that the policy was to be cancelled effective October 19, 1958. *Id.* The accident for which the insured sought coverage occurred on November 16, 1958. *Id.* After the accident, the insured talked to an agent of the insurer over the phone and was told that his policy would be reinstated if he paid the outstanding premium. *Id.* The *Perry* court concluded that the payment made at the instruction of the insurer's agent, though subsequent to the accident, was the very payment called for in the Insurance Extension Certificate and therefore the period of insurance coverage was in fact extended from September 21, 1958 to September 21, 1959 as provided for in the Certificate. 195 N.E.2d at 846.

In this Court's view, the issue in *Perry* was not one of waiver at all, but of estoppel. The Illinois Supreme Court explained in *Vaughn* that the two issues of waiver and estoppel are distinct even though they have similarities and are used interchangeably. 533 N.E.2d at 890. "A waiver is a voluntary relinquishment of a known right, claim or privilege,… whereas… estoppel may arise even though there was no intention on the part of the party estopped to relinquish any existing right." *Id.*

After the *Perry* court announced its conclusion that the payment made at the instruction of the insurer's agent, though subsequent to the accident, was the very payment called for in the Insurance Extension Certificate and therefore the period of insurance coverage was in fact extended from September 21, 1958 to September 21,

1959 as provided for in the Certificate, the court announced the general rule upon which CK premises its argument against EPIC. The court stated "[a]n insurance company that knowingly takes a premium for a policy under conditions that would render it invalid, will not be permitted to say that it is not a binding contract for that reason." 195 N.E.2d at 846–47. That is language of estoppel and it was appropriately mentioned as to the insurer in *Perry* because the insurer there gave its insured every indication that making the payment, albeit delinquent, would reinstate the policy with the effective period—from September 21, 1958 to September 21, 1959—completely intact.

CK cites the rule from *Perry* and argues EPIC *waived* its right to cancel the policy. However, there are no facts from *Perry* comparable to the facts presented here to warrant a similar result. EPIC gave CK no indication that continued payments of the estimated installment payments under the 01 policy would absolve it from the cancellation due to the nonpayment of premium due and owing from the final audit of the 00 policy. EPIC points out that Mr. Sandhu, CK's partial owner and representative, acknowledged during his deposition that he was never told by anyone at EPIC that his policy was going to be reinstated or that coverage would be available to him at any point after the June 10, 2014 cancellation. (Doc. 45-1 at 51-53).

CK also asserts that EPIC agreed to give CK a payment arrangement for the audit premium on 00 policy. (Doc. 46 at 16). Such an agreement would of course be strong evidence that EPIC did ratify the policy with CK. The Court has reviewed the proffered evidence and concludes it does not demonstrate such an agreement.

Document 46-3 at page 25 is an email chain from an EPIC representative and what appears to be representatives of Northern Illinois Insurance Agency, who the Court understands to have managed this EPIC policy. The EPIC representative wrote:

> The Insured on the above account is looking for some sort of accommodation in order to have their policy reinstated – it was cancelled effective 6/10 and is out of Collections' authority. The policyholder has said he tried to request a payment plan for their audit balance long ago from his agency, never received a response, and blames them for the cancellation (the insured has refused to contact his agent regarding this issue, leading me to send this email). If either Sales or Underwriting will process reinstatement, Jeanette has approved a payment plan on the audit balance.

> Please review the below account history and determine whether this is an accommodation you would be willing to make.

(Doc. 46-3 at 25). The Northern Illinois representative responded by stating he was not requesting a reinstatement or any accommodation. (Doc. 46-3 at 25 ("I'm not requesting any reinstatement or accommodation.")). This does not reflect that there was an agreement to give CK a payment arrangement for the audit premium. It only shows that someone from EPIC's collections department, who explained he had no authority to authorize a reinstatement or accommodation, was reaching out to someone who apparently did have the authority to make such a request and that person flat out denied the request. Thus, no ratification was achieved.

V.    **CK OBJECTIONS TO AFFIDAVITS OF WAYNE PIOTROWSKI AND TIMOTHY SPEAR**

CK contends that the Court should not consider the affidavits of Wayne Piotrowski and Timothy Spear because they lack proper foundation and contain impermissible hearsay. CK argues that the affidavits should be ignored because there is Illinois case law holding that "the admission of computer-generated bank records

was held to be reversible error because of the lack of proper foundation. [*People v. Bovio*,] 455 N.E.2d 829, 118 Ill.App.3d 836, 74 Ill. Dec. 400 (1983)" and that "electronic computing equipment are admissible in evidence if relevant and material, only if (1) the electronic computing equipment is recognized as standard equipment, (2) the entries are made in the regular course of business at or reasonably near the time of the happening of the event recorded, and (3) the foundation testimony satisfies the court that the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission. [*Grand Liquor Co., Inc. v. Department of Revenue*,] 367 N.E.2d 1238, 1242, 67 Ill.2d 195, 202 (1977)," (Doc. 49 at 14).

EPIC submitted the affidavit of its employee, Wayne Piotrowski, to support EPIC's claim that it complied with Illinois law in timely fashion notifying the IWCC that it was going to cancel CK's worker's compensation policy. (Doc. 45-9). In the affidavit, Piotrowski avers that he has personal knowledge of the facts set forth in the document. As a condition of his job duties, he had access to a database maintained by the NCCI that stores records of notices of cancellations sent to the NCCI by EPIC. Based upon his personal review of that database, he swears that the NCCI received a notice from EPIC on May 28, 2014 that EPIC was cancelling the 01 policy. Piotrowski's affidavit is sufficient even though he is not an employee of the NCCI, because he affirms he has access to that database and has personally reviewed that database. Thus, this is not a situation where someone is testifying to something from

which they have no plausible basis to have knowledge of the facts to which they are averring.

EPIC submitted the affidavit of Timothy Spears to verify that the NOC provided by EPIC (Doc. 4-3) was a true and accurate copy of the actual NOC generated on May 27, 2014. In the affidavit, Spears also avers that he has personal knowledge of the facts set forth in the document. He states that EPIC maintains a duplicate copy of each NOC it sends to insureds in an electronic system called Image Right. He states he personally reviewed the records maintained in Image Right and based on such review he attests that that the NOC provided by EPIC (Doc. 4-3) was a true and accurate copy of the actual NOC generated on May 27, 2014.

Nothing in the cases cited diminishes the admissibility or relevancy of Piotrowski's or Spears' affidavits. The affidavits have appropriate foundation as they both contain statements that the facts presented were based upon personal knowledge and review by the affiants and provide an understanding of how it is the affiants were in a position to have such personal knowledge. CK's objections are therefore overruled.

## CONCLUSION

For the reasons discussed above, the Court GRANTS Employers Preferred Insurance Company's Motion for Summary Judgment (Doc. 45) and DENIES C&K Hotel Group, LLC's Motion for Summary Judgment (Doc. 46). Defendant Corine Watts did not submit any brief in support or opposition to either motion for summary

judgment and therefore waived any right she may have had to not be bound by the forthcoming Order of this Court.

**IT IS HEREBY ORDERED**:

1. The Court finds that under Illinois law on successive renewal policies, the renewal policy No. EIG 1594376-01 issued by EPIC was lawfully cancelled as of June 10, 2014.

2. Employers Preferred Insurance Company, therefore, has no obligation to defend or indemnify C&K Hotel Group, LLC for Workers' Compensation Claim No. 14-WC-029187 filed by Corine Watts related to an incident that purportedly occurred on July 11, 2014.

3. Moreover, Employers Preferred Insurance Company has no obligation under the insurance policies or any other material presented to this Court in this matter to reimburse Corine Watts for any expenses, costs, or damages arising from any injury that she may have experienced following June 10, 2014.

4. Civil Case terminated.

**SO ORDERED**.

Entered this 14th day of September, 2017.

s/ Joe B. McDade
_____
JOE BILLY McDADE

United States Senior District Judge
